# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 23, 2015 Session

## STATE OF TENNESSEE v. AARON DEAN LAWSON

### Appeal from the Criminal Court for Bradley County
### No. 11-CR-252    Carroll L. Ross, Judge

---

### No. E2014-01788-CCA-R3-CD – Filed October 16, 2015

---

The Defendant, Aaron Dean Lawson, was convicted of two counts of first degree premeditated murder and one count of possession of a firearm by a convicted felon, for which he was sentenced, respectively, to two life sentences and a consecutive two-year sentence. On appeal, he argues that the trial court erred by (1) disallowing expert proof of mental problems which were not such that they prevented his premeditating the murders; (2) admitting evidence of a jail telephone call which he made; (3) allowing proof of prior arrests, some of which resulted in his acquittal; (4) without a hearing, placing the Defendant in a stun-belt during the trial; (5) allowing evidence regarding pistol shells as proof of premeditation; and (6) excluding evidence of a prior consistent statement of the Defendant's father after he had been impeached with an allegedly inconsistent statement. Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Wade V. Davies, Knoxville, Tennessee (on appeal); and Randy G. Rogers, Athens, Tennessee (on appeal and at trial), for the appellant, Aaron Dean Lawson.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Stephen Hatchett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

The Defendant was convicted of the murders of his daughter's maternal grandparents, Eddie and Deborah Phillips. The defense argued that he had gone to the home of the victims to resolve a custody issue and was attacked by the victims and an unknown third person. As evidence, the defense sought to prove, because of longstanding psychiatric problems, the defendant was unable to premeditate the murder of the victims. However, because the defense expert could not conclude that the Defendant's mental problems prevented his premeditating the homicides, the trial court did not allow expert testimony regarding the Defendant's mental health.

In his opening statement, defense counsel advised the jury that, after the killing of the victims, the Defendant went to his parents' residence and told his mother, "I don't have to deal with this anymore. It's over. . . . I shot them. I, I don't have any reason to live. My daughter's gonna hate me, and, I couldn't help it. I didn't have any choice." Additionally, counsel said that the jury would not have "any problem coming to the conclusion that the death of the [victims] came about at the hands of [the Defendant]." He added that the proof would show, "at worst . . . voluntary manslaughter," but the jury might "find self-defense." With this admission, the matter then proceeded to trial.

The victims were killed on April 19, 2011, and the indictments against the Defendant were returned on May 18, 2011. An order for a forensic evaluation of the Defendant was entered on July 5, 2012. The report of the Hiwassee Mental Health Center concluded both that the Defendant was competent to stand trial and that an insanity defense could not be supported. Consequently, the State filed a motion in limine on September 17, 2012, asserting the Defendant's proposed mental health testimony was inadmissible, because it showed only that "the Defendant, as a result of possible bipolar disorder but primarily voluntary drug abuse, is a volatile and temperamental individual." As we will discuss in the analysis section of this opinion, the trial court limited such testimony.

The State's first witness at trial was Detective Kevin White, who was employed by the Bradley County Sheriff's Office and was the case agent for the Defendant's case. He said that on April 19, 2011, he responded to a call at the victims' residence on Leatha Lane, following an 8:45 p.m. telephone call received by a 911 operator. The first officers arrived at the scene at 8:55 p.m., and the Defendant was developed as a suspect. He was taken into custody in Hamilton County on Highway 58, at his uncle's house. Detective White said that the victims were killed with a nine-millimeter handgun, which was not recovered. Attempting to find the murder weapon, officers made four separate roadside searches along routes from the residence of the Defendant's parents toward Hamilton and Meigs Counties. On Hooper Gap Road, one of the routes from his parents' house to Hamilton County, officers found live nine-millimeter ammunition, on which no

fingerprints were found. Detective White identified a Bradley County Criminal Court judgment showing the Defendant had been convicted of felony theft.

Michael Cox testified that he was a detective with the Hamilton County Sheriff's Department. He identified a pistol which was found on Highway 58, in Hamilton County, in a vehicle parked in front of Lawson Wrecker Service.

Recalled as a witness, Detective White identified a recorded disk of a telephone conversation between the Defendant and his father made on July 17, 2011, while the Defendant was incarcerated. Since the playing of this recording to the jury is argued by the Defendant to have been error by the trial court, we will consider the substance of the conversation in the analysis section of this opinion.

Angela Gardner testified that she had been employed for twenty years by the Regional Organized Crime Information Center in Nashville as an intelligence analyst. She received from Detective White telephone records and cell tower information and then charted text messages exchanged on April 19, 2011, between the Defendant and Priscilla Phillips, the victims' daughter and mother of the Defendant's daughter, as well as from the Defendant's daughter to the Defendant. Additionally, she prepared a chart correlating the text messages and the cell towers which were utilized. Generally, the messages showed the strained relations between the Defendant and Ms. Phillips and his desire to see their daughter more often.

W.G. Campbell testified that he was a captain with the Bradley County Sheriff's Office, where he had been employed for twenty-two years. He said that he was trained in using equipment called "Total Station," which measured and mapped crime scenes, and he had used it to prepare a diagram of the location where the victims were found.

Monica Datz testified that she was a crime scene investigator and latent print examiner with the Bradley County Sheriff's Office. She said that on April 19, 2011, she responded to a call to 184 Leatha Lane, the victims' residence, where she took a series of crime scene photographs, a number of which were introduced as exhibits through her.

Detective Mike Hughes of the Bradley County Sheriff's Department testified that he took possession of the pants the Defendant was wearing when he was arrested. Josh Abernathy testified that he had been employed by the Tennessee Bureau of Investigation ("TBI") as a serologist at the time of the homicides. He performed DNA tests on samples of the blood on the pants the Defendant was wearing at the time of his arrest, and two of the three spots of blood matched that of one victim, Deborah Phillips. The third spot was the blood of an unidentified male, and appeared to be the oldest, because it was "very

pale and almost blended into the background of the jeans." DNA found on the cigar butt in the backyard was that of the male victim, Eddie Phillips.

Priscilla Phillips testified that she was the daughter of the victims, Eddie and Deborah Phillips. She said that her daughter, Madison, who had been fathered by the Defendant, wanted to attend the 2011 Easter Egg Hunt at the home of her Aunt Chris. Prior to the death of the victims, Madison had last seen the Defendant two weeks earlier and it was her choice as to whether she would see him the weekend of the homicides. Priscilla Phillips testified that she found out about the death of her parents the day the Defendant killed them.

Madison Lawson testified that she was fourteen years old and the daughter of Priscilla Phillips and the Defendant. She said that, on April 19, 2011, she sent a text message to her father about her attending the Easter egg hunt at the home of her Aunt Chris.

Heath Arthur testified that he was employed by the Bradley County Sheriff's Office and, on April 19, 2011, while at the residence of the Defendant's parents, he was handed by their minister a magazine which contained thirty-one live rounds of nine-millimeter ammunition.

Marilyn Grissom testified that she was a neighbor of the victims, living next door to them. On the night the victims were killed, before emergency medical personnel arrived, she saw the headlights of a vehicle as it left the victims' house, "going very fast."

Jeanine Redman testified that, on the night of the homicides, she was at the home of her sister, Marilyn Grissom, and saw "just a blur pulling out of the driveway of her neighbor's house." Just before the vehicle left, she had heard a noise, which she later realized were gunshots.

Kevin Warner testified that he was a special agent and forensic scientist with the TBI, assigned to the Firearms Identification Unit. He said that all the cartridge casings found at the crime scene had been fired from the same weapon, and the slugs removed from the bodies of the victims were from a nine-millimeter pistol. He said that the magazine obtained from the home of the Defendant's parents fit a Taurus model PT-92 nine-millimeter Luger semi-automatic pistol, as would the recoil spring guide rod recovered from the Defendant's vehicle.

Carl Maskew testified that he was a detective with the Bradley County Sheriff's Office and, following the killing of the victims, had conducted a search of the Defendant's residence, where he found two unspent .40 caliber bullets and two spent .40

caliber rounds. He did not find a nine-millimeter pistol or ammunition for such a weapon.

Detective J.P. Allman of the Bradley County Sheriff's Office testified that his duties included analysis of digital evidence. He was asked to attempt to track the locations of the Defendant's cell phone on April 19, 2011, but he was unsuccessful in doing so. He said that a cell phone could not be tracked if its battery had been removed and that the Defendant would have had to take apart the cell phone case to remove the battery.

Detective Shaunda Efaw of the Bradley County Sheriff's Office testified that on April 20, 2011, when she tested the Defendant's hands for gunshot residue, he said he had fired a .40 caliber pistol earlier and asked if the test could determine what kind of gun had been used. She responded that she did the testing and the laboratory did the analysis. She then submitted the test kit she had collected to the TBI.

Angie Gill testified that she was employed by the Bradley County School System and was acquainted with both of the victims. On the night the victims were killed, she saw them at an O'Charley's Restaurant around 6:30 p.m., and saw them leave between 7:00 and 7:30 p.m. She spoke to them briefly, and neither seemed to be intoxicated.

Dewayne Scoggins testified that he was a detective with the Bradley County Sheriff's Office. On April 25, 2011, he obtained a receipt dated April 19, 2011, at 8:19 p.m. from the Fish Creek Market for gasoline and a twelve-pack of Bud Lite beer. This market is a three- or four-minute drive from the residence of the victims.

Tammy Duckett testified that she was employed at a market formerly known as Mr. Zip's, which had been renamed Fish Creek Market. She identified the sales receipt from the market and said the beer had been purchased by a woman in a black Hummer, and the male with her bought gas but did not come into the store. The woman did not appear to be intoxicated.

Nancy Rowland testified that she was a neighbor of the victims. Her house was on the same side of the street as theirs, and two houses down. On the night they were killed, she was in her home and, between 7:00 p.m. and 8:00 p.m., heard noises she thought were fireworks but later learned they were gunshots.

Dr. Christopher Lochmuller testified that he was employed by the Knox County Medical Examiner's Office and that he performed autopsies on both of the victims. Eddie Phillips had been shot once in the left flank, once on the left side of his chest, and once in the upper portion of his back toward the middle. All of the shots went from back

5

to front and left to right. Dr. Lochmuller opined that the cause of death was multiple gunshot wounds. Deborah Phillips also had three gunshot wounds, one to her right wrist, one to her right arm, and one which entered the back of her neck, exited on the left side of her back and also exited the front of her left arm. The bullet which entered her neck hit her second vertebrae, went through her right carotid artery, through the throat, and exited the left side of her neck, then striking her clavicle, with part of the slug going through the skin on the left side of her upper back and the rest exiting the skin on the front of her arm. The fracture of her jaw could have resulted from her falling to the ground. There was no evidence either victim had been involved in a fight prior to the shootings. Mrs. Phillips died as a result of the three wounds, the most serious was to her neck.

James Russell Davis, II, testified that he was a special agent and forensic scientist with the TBI, working in the Microanalysis Unit. He received the gunshot residue kit with samples taken from the Defendant and, according to his report, "[E]lements indicative of gunshot residue were present. The results indicate the individual could have fired, handled, or was near a gun when it fired." Testing of kits from the two victims was "inconclusive," meaning that each "could have fired, handled, or was near a gun when it fired."

Following this testimony, the State rested its case-in-chief.

The Defendant's first witness was Prince Miller, a Bradley County attorney who had represented the Defendant in a previous matter, to whom the Defendant acknowledged that Madison Lawson was his daughter and that he had been paying voluntary child support since her birth. Mr. Miller filed a petition for legitimation of the Defendant's daughter and to establish visitation and parenting rights, as well as secure the Defendant's obligation for support and maintenance.

Jerry Hoffer testified that he was an attorney in Cleveland, Tennessee, specializing in domestic relations. He began representing the Defendant when Madison was "[f]ive or six years old." He filed a petition for contempt because the Defendant was not being allowed court-ordered visitation. He described the Defendant as "intense" about wanting to visit his daughter.

Gayla Harris Miller, the Bradley County Circuit and Criminal Court Clerk, testified regarding the various petitions filed in previous years regarding the Defendant's visitation rights with his daughter.

Kathleen Hill testified that she was a neighbor of the victims. She said that on the evening of April 19, 2011, she heard what she first thought were fireworks but later

6

learned were gunshots. There first were two or three shots and then, "within seconds," two more.

James David Cross testified that he was the pastor of the Gum Springs Baptist Church, a chaplain for the Cleveland Police Department, and the owner of a business, Electronic Solutions. The Defendant and his parents were members of his church. Pastor Cross recalled three instances involving the Defendant which "really, really, really concerned" him. The first occurred at his church, when a church member told him that the Defendant was drunk and tried to hit the member with a stick as he rode past the Defendant on a motorcycle. The second event was when the Defendant and another man began fighting as Pastor Cross and several church members were preparing to take a number of youth on a trip, and the third occurred when the Defendant's father called asking for help because the Defendant and his brother had "been into it." Pastor Cross said the Defendant "needed to get some help," because "he could go from one [extreme] to the other just like that."

On the night the victims were shot, Pastor Cross received a telephone call from the Defendant's mother, saying, "Aaron has shot the Phillips's. You need to get them some help." Pastor Cross then went to the house of the Defendant's parents, where Mr. Lawson handed him a pistol clip, saying he had found it at their house. He said he knew the Defendant had been excited about seeing his daughter that weekend. The following morning, he was called by the Defendant's brother and asked to come to his parents' house. He met with them there, they told him where the Defendant was located, and he passed that information along to police officers. As a result, the Defendant was taken into custody without incident.

Roy Dean Lawson, the Defendant's father, testified that the Defendant had dropped out of high school in, he believed, the eleventh grade and, later, had obtained a GED. He said the Defendant had "messed his neck up" in a forklift accident at his place of employment and was no longer able to work. After that, he became "short fused, real easy to go off." Following the birth of his daughter, the Defendant went "downhill." For several years, the Defendant received mental health treatment but, returning from two periods of hospitalization, he was "no different." Some of his prescribed medication was helping him, but he was taken off of it by Hiwassee Mental Health Center.

The Defendant testified regarding his history with Priscilla Phillips, saying that they had started dating when both were in the ninth grade, and both had quit school in the eleventh grade. Subsequently, he received a GED. Following the birth of their daughter, she moved back to her parents' house.

7

The Defendant said that, on the day of the shootings, he went to the victims' home to talk about his visitation rights with his daughter. He left his .40 caliber pistol in his vehicle, and yelled out to Mrs. Phillips, whom he heard in the backyard. She and Mr. Phillips were both there, and the Defendant began fighting with Mr. Phillips and another man, who had come through a fence opening. He then heard a gunshot, Mr. Phillips made a "grunting noise," and the three stopped fighting. The unidentified man ran, and the Defendant saw that Mrs. Phillips was holding a gun. He went to her, and they struggled. He hit her and took the gun from her, which caused the gun to discharge. Mr. Phillips went toward his truck to retrieve a gun, and the Defendant warned him not to do so. When Mr. Phillips did not stop, the Defendant shot him "a couple" of times. Mrs. Phillips said she had another pistol in her purse, so he then shot her "a couple of times" as she apparently reached for it. He picked up a holster and clip and went to his parents' house, where he washed his hands. He talked with his mother but could not remember what he said to her. The Defendant said he did "[n]ot at all" intend for the shootings to happen. He left his parents' house and went to the home of his uncle. Although his route took him on Hooper Gap Road, he denied he discarded ammunition there. To his father, he recalled saying he had to get rid of the pistol "[b]ecause [he] just shot two people with it." The Defendant claimed he shot the victims in self-defense. He said he left the scene, rather than stay and talk with officers, because he did not like the police. He said he was unaware he had dropped the clip in his father's driveway. He took the pistol apart and threw it in pieces out the car window on Highway 60.

Following this testimony, the defense rested.

## ANALYSIS

We will review the issues raised on appeal by the Defendant.

### I. Exclusion of Evidence of Defendant's Mental Illness

On appeal, the Defendant argues that the trial court's ruling denying his presenting expert testimony regarding his mental illness deprived him of his right to present a defense and was contrary to the Tennessee Rules of Evidence. Additionally, he argues that the past decisions of this court misread decisions of the Tennessee Supreme Court in our concluding that a defendant, charged with first degree premeditated murder, can present expert proof of mental illness only if the expert concludes that the defendant completely lacked the capacity to premeditate. As we will explain, we disagree with this argument.

On September 26, 2012, a hearing was held on the State's motion in limine regarding such testimony. Testifying on behalf of the Defendant was Dr. James Walker,

a psychologist licensed in Tennessee since 1993, focusing primarily on forensic psychology and psychiatry. He said that, according to medical records, the Defendant first received psychiatric treatment in 2003, when he was admitted to the Valley Psychiatric Hospital for "various mood problems and substance addiction issues." The Defendant told those treating him that he was "having a lot of trouble controlling his temper, had trouble getting angry very easily, and he interestingly told his psychiatrist that he had shot himself with a firearm six years before in a suicidal gesture." Over the next few years, the Defendant was seen by a psychiatrist, Dr. Sultan, who diagnosed him with "several serious psychiatric conditions, including major depression, polysubstance dependence, and suicidal behavior." The Defendant's psychiatric rating indicated he was "functioning very poorly at times." He next was seen by Dr. Sean Brown in 2009 and was seeking pain medications because of "severe problems with pain."

In August 2010, the Defendant was admitted to the Moccasin Bend Mental Health Institute because of suicidal thoughts and behavior. He was angry with an attorney and was thinking about taking the life of "another person." He was discharged with a diagnosis of "mood disorder and opioid dependence." His rating on the Global Assessment of Functioning ("GAF") Scale was between 20 and 25, and Dr. Walker explained what this meant:

> That means that [the Defendant] in their estimation was functioning so poorly that he couldn't live outside of a safe facility. He needed to have someone there to take care of him, to make sure that he didn't either injure himself or someone else or not, was not able to take care of himself to a sufficient degree without significant outside help.

Dr. Walker said the various findings "certainly indicated that [the Defendant] has a long history of very serious impairment in his psychiatric functioning." Dr. Walker said it was common for a patient with bipolar disorder, such as the Defendant, to seek out morphine or oxycodone. He said that, at times, the Defendant also had been diagnosed with major depression. Additionally, the Defendant had sustained in the past one or two "very significant" head injuries. As for the Defendant's ability to premeditate on the day of the homicides, Dr. Walker believed that he was "very significantly impaired": "[M]y understanding is that premeditation refers to a person's ability to deliberate and reflect upon their actions, and there's no question in my mind that [the Defendant's] ability to act with deliberation and judgment was very significantly impaired on the day in question." Dr. Walker further stated that he could not say, however, that the Defendant was unable to premeditate on the day of the homicides.

Following the hearing, the trial court entered a lengthy written order, concluding that the Defendant would not be allowed to present expert proof in this regard:

9

The Court[,] having considered all of the aforesaid, finds that even though the record in this cause demonstrates that the [D]efendant has, for a number of years, been treated for and hospitalized at least 2 times for specific diagnosed mental illnesses, defects and conditions; and that even though the evidence demonstrates the [D]efendant was, based upon the expert's opinion, suffering, at the time of the alleged offenses, from significant and serious mental illnesses, diseases and defects as reflected in the report which is attached as [an] exhibit to this order, that the experts['] opinions and testimony concerning the [D]efendant, his mental condition at the time of the offense, the effects of the same, are such that the evidence and opinion testimony of the experts should be excluded even though their opinion that the nature of the illness, defects and conditions suffered by the [D]efendant within a reasonable degree of medical certainty significantly and substantially impaired the [D]efendant's ability to formulate premeditation and substantially and significantly impaired his ability to appreciate the wrongfulness of his acts or the nature of his conduct.

Further, the trial court detailed the specific issues for which expert proof was prohibited:

    1) That the expert opinion testimony should be excluded as to the issue of insanity as codified in T.C.A. § 39-11-501.

    2) That the expert opinion testimony proffered should be excluded as to the issue of the required culpable mental state as codified in § 39-11-301.

    3) That the proffered expert opinion testimony should be excluded with regard to whether or not the [D]efendant, at the time of the alleged offenses, was suffering from a severe mental illness or defect.

    4) That the proffered expert opinion testimony should be excluded with regard to the culpable mental state of the [D]efendant at the time of the alleged offenses as codified in T.C.A. § 39-11-302.

    5) That the proffered expert opinion testimony should be excluded as to the [D]efendant's theory of self defense as codified in T.C.A. § 39-11-611(8)(B).

Additionally, the court set out the issues for which lay testimony could be

provided:

> The Court specifically finds, however, that the [D]efendant, by virtue of this ruling, shall not be precluded from reliance upon the defense of insanity and that he may, pursuant to all recognized Rules of Evidence and case law in the State of Tennessee proffer lay testimony and proof concerning the [D]efendant's previous hospitalizations, mental illness, and lay opinions as to whether or not the [D]efendant was capable of formulating the requisite culpable mental state or whether or not the [D]efendant was insane at the time of the alleged offenses.
>
> The Court specifically finds that the [D]efendant may offer lay testimony pursuant to Tennessee Rules of Evidence 701 et seq. as to the mental condition of the [D]efendant, his culpable mental state, and his insanity at the time of the offenses. The [D]efendant may not offer the testimony by Dr. Walker or Dr. Street as experts as proffered in this record to the jury pursuant to Tennessee Rules of Evidence 702 et seq.

As to these limitations, the Defendant's argument on appeal is that the trial court deprived the Defendant of his right to present a defense through expert proof of mental illness which, in his view, was admissible under the Tennessee Rules of Evidence and relevant to rebut the State's claim of premeditation. The State responds that this constitutional argument is waived because it was not raised until his appeal. Regarding the validity of the claim that such evidence is admissible under the Tennessee Rules of Evidence, the State responds that relevant decisions of the Tennessee Supreme Court, as well as this court, all have concluded that such evidence is not permitted under the circumstances present in this matter.

Subsequently, the Defendant filed with this court an application to appeal, pursuant to Tennessee Rule of Appellate Procedure 9, but it was denied. The trial then followed. We will review Tennessee case law in this regard.

In *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), defense counsel sought to produce at trial expert testimony regarding the myriad psychological problems of the defendant, who was charged with first degree premeditated murder and aggravated arson:

> Dr. [Roger] Meyer testified that a mental status examination revealed that the defendant [Hall] was not insane or psychotic. A Slosson Intelligence test indicated that the defendant's IQ was eighty-seven, and that his mental age was thirteen years, eleven months. The defendant's basic skills, as measured by a Wide Range Achievement test, showed a

11

grade level 6 to 9 education in the general areas of reading, spelling, and arithmetic. A neuropsychological examination did not reveal any evidence of significant neurological trauma to Hall's brain. A sixteen-factor personality test revealed that Hall is introverted, emotionally unstable, easily influenced, and has low self-esteem. According to Dr. Meyer, the test reflects that the defendant has little self-control and is not rule abiding or moralistic. Though the defendant is not a psychopath or sociopath, Dr. Meyer opined that Hall has problems controlling rage and anger.

A Rorschach "Ink Blot" test showed that Hall has a great deal of difficulty reacting appropriately to stressful situations. Dr. Meyer described Hall and the victim's relationship as an "emotional tug of war," and said that it would have created a great deal of tension and frustration in a person with the defendant's psychological makeup. Though some of the test results indicated that the defendant was "faking bad" or malingering, Dr. Meyer explained that such results do not necessarily mean that a patient is faking, but can also reflect that a patient is simply overemphasizing the stress and emotional problems he or she is experiencing.

Dr. Meyer diagnosed the defendant as suffering from borderline personality disorder. Dr. Meyer testified that persons with this disorder characteristically have severe emotional problems and problems with thinking and judgment.

*Id.* at 686-87.

Our Supreme Court explained why Dr. Meyer's testimony in *Hall* regarding the defendant's numerous psychological problems was not admissible at the trial:

[W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue. *State v. Shelton*, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992), *perm. app. denied* (Tenn. 1993).

*Id.* at 690.

This issue was examined again in *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005),

12

wherein the court described the expert testimony proffered by the defendant, concluding that it was not admissible at trial:

> At a jury-out hearing, Dr. [Fred] Steinberg testified that Faulkner had experienced significant, multiple stressors at the time of the offense ranging from loss of job to marital problems. He also suffered from exacerbation of a drug problem. His grandmother was hospitalized. His best friend, whom he felt was like a brother, had committed suicide. All of these stressors occurred within a short period of time. According to Dr. Steinberg, these stressors in combination affected Faulkner's "predisposed tendency to have a short fuse." However, Dr. Steinberg found no indication that Faulkner suffered from a mental disease or defect at the time of the offense. In short, Dr. Steinberg believed that Faulkner was capable of forming intent but that his ability to suppress his emotions was impaired. [Patricia] McNealy would have testified about Faulkner's drug dependency. Defense counsel described her testimony as "dovetailing" with Dr. Steinberg's testimony because she would be relating one of the stressors affecting Faulkner. The trial court ruled that Dr. Steinberg's testimony was inadmissible at the guilt phase under *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), because Dr. Steinberg could not testify that Faulkner was incapable of forming intent as a result of a mental disease or defect.

*Id.* at 56.

Our Supreme Court affirmed the exclusion of Dr. Steinberg's testimony, explaining:

> Dr. Steinberg's testimony was not offered to show that Faulkner lacked the capacity to form the requisite intent because of a mental disease or defect. His proposed testimony, therefore, did not meet the prerequisites of *Hall*. Accordingly, we conclude that the trial court properly excluded the testimony of both Dr. Steinberg and Patricia McNealy during the guilt phase.

*Id.* at 57.

Subsequently, in *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009), the Court amplified its earlier holding, saying that "our decision in *Hall* established that the testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense." Thus, the trial court

13

erred in excluding the following testimony of a physician that the defendant was incompetent to plan a crime or understand the consequences of his actions:

> While acknowledging that the [d]efendant did not suffer from a psychiatric condition, Dr. [Steven] Adams made a diagnosis of organic brain syndrome, a condition causing deficits in cognition, and in short-term and long-term memory, which had an adverse effect upon the [d]efendant's awareness of his surroundings. It was his opinion that the [d]efendant was not "competent to intentionally commit a crime that requires [any degree of] planning . . ." and that the [d]efendant was unaware of "the full consequences of [his] action."

*Id.* at 380-81.

Additionally, this court has dealt with the issue on several occasions.

In *State v. Antonio D. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207 (Tenn. Crim. App. Nov. 1, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007), Dr. William Bernet was proffered by the defendant to testify as to his mental state:

> Dr. Bernet testified that although the [defendant] had never been diagnosed with a psychotic condition, he had a history of psychotic symptoms such as hallucinations. He stated that according to his report, the [defendant] drank three beers on the date of the crimes and denied using cocaine. He acknowledged that drinking only three beers would make it less likely that the [defendant] was suffering from alcohol intoxication at the time of the crimes and acknowledged that the [defendant's] denying he used cocaine would also affect Dr. Bernet's diagnosis of cocaine intoxication. Although the [defendant] was suffering from PTSD at the time of the crimes, Dr. Bernet did not know what symptoms of the disorder the [defendant] was exhibiting at the time of the shooting. Finally, he stated that "I cannot say that he totally lacked the capacity [to premeditate]. I am saying, simply, that his capacity was impaired to some extent." On redirect examination, Dr. Bernet acknowledged that he was not concluding the [defendant] did not premeditate the crimes but was concluding that all of the factors he had discussed "contribute[d] to this reduced ability to premeditate."

*Id.* at *2.

While the State asserted that this testimony was inadmissible, the defendant contended otherwise:

14

The defense argued that the testimony was admissible because it was helpful in assisting the trier of fact to determine whether or not the [defendant] lacked the capacity to premeditate. The trial court ruled that Dr. Bernet could testify and that the ultimate question regarding the [defendant's] mental state at the time of the crimes was a jury question. The State filed an application for permission to appeal pursuant to Rule 9, Tennessee Rules of Appell[ate] Procedure, which the trial court granted on January 12, 2006. By order, this court granted the State's application for Rule 9 interlocutory review on March 3, 2006.

*Id.*

Following our review, we reversed the trial court's determination that Dr. Bernet could testify regarding the defendant's mental impairment:

> In the instant case, Dr. Bernet testified about the [defendant's] PTSD and dysthymic disorder and stated in his report that the [defendant] was suffering from these "serious psychiatric disorders" at the time of the crimes. However, the State and the defense asked him several times if he could say that the [defendant] lacked the capacity to premeditate or act intentionally, and Dr. Bernet repeatedly stated that he could not say that the [defendant] lacked the capacity to form the culpable mental states but could only say that his capacity was "impaired to some extent." The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in *Hall* and *Faulkner*. Therefore, his testimony is irrelevant and inadmissible.

*Id.* at *4.

We next considered this issue in *State v. Anthony Poole*, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868 (Tenn. Crim. App. Apr. 14, 2009), *perm. app. denied* (Tenn. Sept. 28, 2009), where the defendant sought to present testimony of his impairments:

> In the instant case, Dr. [Joseph] Angelillo's testimony was not offered to negate the requisite mental state, but to show that the [defendant's] cognitive impairments impacted his ability to react appropriately in certain situations. Dr. Angelillo explained his assessment, stating that he was concerned with the [defendant] "responding when he is frustrated because he doesn't have a way out of the situation. . . . In this case, for [the defendant] to respond, in a frustrated perhaps angry way, I think would be

15

increased, as compared to the, quote, average person."

*Id.* at *11.

Our court, noting that Dr. Angelillo's "testimony basically reflected that the appellant was easily frustrated and likely to act inappropriately in stressful situations," agreed with the trial court that the testimony was irrelevant and immaterial. *Id.*

Next, in *State v. Herbert Michael Merritt*, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *1 (Tenn. Crim. App. Mar. 22, 2013), *perm. app. denied* (Tenn. Aug. 13, 2013), the defendant was convicted of first degree murder and argued, on appeal, that the trial court erred in excluding an expert opinion regarding the defendant's "ability to form specific intent." We described the excluded testimony:

> In a pre-trial hearing, Dr. [James] Murray testified that [d]efendant's mental disease or defect at the time of the offense was that he "had a psychotic disorder of a chronic nature, be it bipolar disorder or schizophrenia or some kind of organically based psychotic level of impairment." Although there was a possibility that [d]efendant had PTSD, Dr. Murray could not say within a reasonable degree of medical certainty that [d]efendant had the disorder on June 18, 2008. Dr. Murray agreed that he could not say within a reasonable degree of medical certainty that [d]efendant was incapable, due to his mental disease or defect, of premeditating the victim's murder. Likewise, he could not say that [d]efendant's mental disease or defect rendered [d]efendant incapable of committing a knowing or intentional killing.
>
> On cross-examination, Dr. Murray testified that due to [d]efendant's "mental diseases or defects that his capacity to accurately perceive the reality of the circumstances of that event were grossly impaired." He further said that [d]efendant's judgment was grossly impaired. Upon further cross-examination, Dr. Murray testified that [d]efendant's "ability to reflect and exercise reasoned judgment was grossly impaired by his psychotic state and by the impact of post-traumatic stress disorder like symptomology."

*Id.* at *22.

We explained why the testimony of Dr. Murray had been properly excluded by the trial court:

16

Because Dr. Murray in exhibits 186 and 187 did not state that [d]efendant completely lacked the capacity to commit premeditated first degree murder in this case, the trial court did not abuse its discretion in excluding the evidence. The evidence in question merely indicated that [d]efendant's mental disease or defect impaired or reduced his capacity to form the requisite mental state and therefore, did not satisfy the two-prong requirement of *Hall* and *Faulkner*. The evidence was irrelevant and inadmissible.

*Id.* at *27.

Next, in *State v. Tray Dontacc Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655, at *4 (Tenn. Crim. App. May 14, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014), this court reviewed the determination of the trial court that a psychologist could testify the combination of the defendant's borderline mental capacity and certain situational factors "eroded" his ability to premeditate. We explained why the trial court had erred in concluding that this testimony was admissible:

[T]he case law holds that expert testimony regarding a defendant's mental state is relevant and admissible only to establish that, at the time of the crimes, the defendant lacked the capacity to premeditate. Since Dr. [Robert] Kennon's testimony did not do so, we conclude that the trial court erred in finding that the testimony was admissible.

*Id.* at *9.

In *Derek Williamson v. State*, No. M2014-00183-CCA-R3-PC, 2015 WL 1736235 (Tenn. Crim. App. Apr. 14, 2015), *perm. app. denied* (Tenn. July 21, 2015), this court again considered this argument. In that case, the defendant shot and killed the former boyfriend of the defendant's then girlfriend. Following his conviction for first degree premeditated murder, the defendant sought post-conviction relief, two of his claims being that trial counsel had been ineffective for failing to present a mental health expert witness at the trial and that the trial court had erred in ruling that testimony from Dr. Stephen Montgomery, a forensic psychiatric expert, would have been inadmissible if called as a witness at the trial. Dr. Montgomery's testimony would have been that while "the [defendant's] PTSD and alcohol consumption would have significantly impaired his ability to exercise refection and judgment," and it "was more likely than not that the [defendant] lacked the capacity to form the culpable mental state for the offense, [Dr. Montgomery] was unable to state that this was his opinion to a reasonable degree of medical certainty." *Id.* at *6. The court explained why this testimony was not admissible:

17

Dr. Montgomery stated only that it was a possibility that due to a mental disease or defect, the [defendant] lacked the capacity to form the required mens rea. Although Dr. Montgomery was able to state an opinion with certainty regarding the [defendant's] PTSD and substance use disorder diagnoses, evidence of these diagnoses was not relevant and admissible without an opinion regarding the ultimate issue of the [defendant's] capacity to form the required mens rea.

*Id.* at \*15.

On appeal, the Defendant has presented a review of the appellate decisions dealing with this issue, arguing that this court has misread relevant opinions of the Tennessee Supreme Court to conclude that expert psychiatric testimony, such as that offered in this case, is not admissible. We disagree with the Defendant's argument and note that, in *Williamson*, *Chaney*, *Merritt*, *Poole*, and *Idellfonso-Diaz*, our Supreme Court has denied applications for permission to appeal. Therefore, we follow the previous decisions of this court and conclude that the trial court did not err in excluding the testimonies of Drs. Walker and Street.

## II. Allowing Testimony Regarding the Defendant's Jail Telephone Calls

The Defendant argues that the trial court erred in allowing into evidence a recording of a jail telephone call between the Defendant and his father. The recording was played for the jury both during the State's case-in-chief and the cross-examination of the Defendant's father. According to the Defendant, the trial court abused its discretion in this regard because, during the call, the Defendant used "profanity [and] repeatedly remarked that he was going to remain silent and said that others should have [done so] as well," and the call introduced a "damaging claim" that he had been wearing a bulletproof vest during the incident. The State responds that, since the probative value of the telephone call outweighed its prejudicial effect, the trial court properly exercised its discretion in allowing the evidence.

The State, as it argued to play this audiotape for the jury, asserted that it was relevant to show the Defendant was questioning why "people in his family are telling law enforcement what happened," while the Defendant, according to the State, "kept his mouth shut" and that the conversation showed the Defendant "intended to get away with this crime." Counsel for the Defendant argued that the taped conversation was inadmissible, because it showed the Defendant's "commenting about the fact that he has chosen not to give any statements" and that he was "relying upon his right to remain silent." Counsel further argued that "the prejudicial value outweighs anything, and he

18

doesn't make any admissions." Responding to an inquiry from the court, both counsel agreed that there was a sign posted near the telephones used by inmates that read, "Your phone call is being recorded." Following lengthy arguments by counsel, the court then ruled that the Defendant should have been aware that the conversation was being recorded and, based upon the State's theory of the case, the recorded conversation was admissible. After additional arguments by counsel, the court further explained this ruling, saying:

> [O]ne thing both of you are ignoring, and it's something I cannot help but sit here when I'm listening to that tape, an even more important issue that I'm going to allow it in on. Counselor suggested there may be issues of insanity involved. One might be able to listen to this tape and think that someone who talks this way, this rationally about whatever was going on is not insane, so it may go even more to that issue than it does the things the State's suggesting. So for those and the other issues, I'm going to allow it in.

In his motion for new trial, the Defendant argued that, in allowing the jury to hear the recorded conversation, the trial court erred in not "making an appropriate assessment of the relevancy, materiality or probative value of such recording in its totality or in its redacted form as to any issue in the case." Further, the Defendant argued that the court erred by not listening to the entire tape, and not the redacted version proffered by the State to determine if the complete tape was "relevant or material to any issue" and whether the State's redactions had been accomplished "without destruction of or misinterpretation of the meaning of said conversation or its reasons for occurrence."

On appeal, the Defendant argues that "playing for the jury [the Defendant's] repeated statements that he was not going to talk under this theory it was relevant to sanity is equivalent to the comment on the Defendant's silence in *Wainwright v. Greenfield*, 474 U.S. 284, 287 (1986), where the United States Supreme Court found a violation of the Due Process Clause when the prosecution was permitted to introduce evidence that the defendant had 'exercised his right to remain silent and . . . expressed a desire to consult counsel before answering any questions,' as inconsistent with his insanity defense." The State responds that since this constitutional claim was neither raised during the trial nor in the motion for new trial, it is waived. In his reply brief, without conceding waiver, the Defendant submits that this court can review the issue under a plain-error analysis.

When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review. *State v. Faulkner*, 154 S.W.3d 48,

58 (Tenn. 2005); *see also* Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b). Therefore, the defendant's constitutional claim in this regard is waived, because it was presented for the first time on appeal. We will review this claim as plain error.

As for a plain error review, which the Defendant requests, the Defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007). Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

"[Q]uestions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).

The Defendant has made an issue of his mental state before and during the crimes. Given this, we agree with the trial court that the Defendant's statements to his father during the conversation were relevant to the State's theory of the case. Thus, the trial court did not abuse its discretion in this regard. Although the Defendant further argues that the "bell" could not be "unrung" after he, himself, had brought up in the conversation that he was not wearing a bulletproof vest at the time of the slayings, as he believed some had said, we note that immediately after the jury heard the recorded conversation, Detective White, continuing his testimony, said there was no proof that the Defendant was wearing a bulletproof vest on the day of the homicides. Accordingly, we conclude that this issue is without merit.

### III. Allowing Testimony Regarding the Defendant's Arrest Records

Before the trial began, the Defendant filed a motion in limine to bar evidence regarding his arrests which had not resulted in convictions. During the redirect-examination of Priscilla Phillips, she said the Defendant had been convicted of felony theft in 2003 and that he had been "arrested many times." She acknowledged he had been acquitted on some of the charges and others had been dropped. Later in the trial, defense witness Prince Miller, an attorney who had previously represented the Defendant, volunteered during his direct examination that the Defendant had been arrested for "controlled substances and he was given judicial diversion."

20

The Defendant argues, and the State agrees, that the trial court erred in allowing evidence regarding the Defendant's prior arrests. In the view of the State, however, the error was harmless, and we agree. The trial proceeded upon defense counsel's admitting that the Defendant had killed the victims, and, even independent of that, evidence was overwhelming that he had done so. Thus, the error in admitting this evidence was harmless.

## IV. Placing the Defendant in a Stun-Belt Without a Hearing

The Defendant argues that placing him in a stun-belt without a hearing violated his right to due process to the full use of his faculties during the trial. The State responds that the claim is waived because there is no evidence this claim was made to the trial court.

The record on appeal contains a January 13, 2014, memorandum from Sergeant James E. Bradford, Jr. to the trial court advising that, during the Defendant's trial scheduled to begin the following day, court officers would be "utilizing the stun-belt during the course" of the trial. The memorandum further states that "[c]ourt security personnel handling this device have received proper training, and are still currently up to date on the certification." This followed a September 24, 2012, memorandum, also from Sergeant Bradford, in which he advised the court that the Defendant had several disciplinary write-ups while housed in the Bradley County Jail, apparently for threats of violence and possession of a handmade weapon found in his cell, and, for these reasons, court security would be utilizing a stun-belt on the Defendant during an earlier setting of his trial. On appeal, the Defendant concedes that no objection was raised at trial to this procedure nor was it presented as an issue in the motion for new trial. Accordingly, we conclude that this issue is waived. *See* Tenn. R. App. P. 3(e) (issues not specifically raised in a motion for new trial are waived); Tenn. R. App. P. 36(a). Additionally, for several reasons, we conclude that we may not employ a plain error review of this issue.

There is substantial evidence of the Defendant's misbehavior during the trial. During Dr. James Walker's testimony, he said that the Defendant was "very unstable, . . . very volatile" and had a "very short fuse." Later, as Dr. Walker was being cross-examined about the various illegal drugs found at the Defendant's home and the Defendant's problems with "substance abuse," the Defendant interjected, "Bullshit." When warned by the court against any further outbursts, the Defendant responded, "That's a lie." As the Defendant's daughter finished testifying, he said to her, "Love you, Madison." During a recess, according to the transcript, the Defendant told a court officer, "I got to use the bathroom." When told to sit down, the Defendant then said, "You want me to piss right here? Huh?" As his father was testifying on redirect examination, the Defendant apparently began muttering comments, which stopped only after the court's

third consecutive command to be quiet. Soon after that, as his counsel was making an argument to the court regarding statements taken from the Defendant's parents, the Defendant again made an "[i]ndiscernible" comment, and counsel advised his client, "Be quiet or you're gonna get shocked." Based upon the Defendant's conduct while in jail, as well as his continuing disobedience during the trial, we conclude that the trial court did not abuse its discretion in ordering that the Defendant wear a stun-belt during the trial. *See State v. Hall*, 461 S.W.3d 469, 497-99 (Tenn. 2015). Thus, consideration of this issue is not necessary to do substantial justice.

## V. Allowing Evidence Regarding Pistol Shells Found By the Roadside

The Defendant argues on appeal that the trial court erred in allowing testimony regarding ammunition found by the roadside because there is no proof they were related to the crimes. The State responds that the cartridges were circumstantial proof of the Defendant's guilt. We agree with the State.

The testimony showed that the Defendant drove along Hooper Gap Road, as he went from his parents' home, where an extended capacity magazine with thirty-one live nine-millimeter shells was found, to the home of his uncle. Investigator Datz said that the ammunition found on the roadside was the same caliber, and from the same manufacturer, as that from the extended magazine at the home of the Defendant's parents. The metal recoil spring guide rod found in the Defendant's vehicle fit a nine-millimeter pistol, which was the caliber weapon used to kill the victims.

Accordingly, we conclude that the trial court did not abuse its discretion in allowing testimony regarding the recovery of these bullets. Further, in view of the defense admission that the defendant shot the victims, any error in admitting this proof was harmless.

## VI. Excluding Statement of the Defendant's Father

As we understand this issue, the Defendant's father testified on cross-examination that he could neither recall the Defendant's telling him that the Defendant had to get rid of the murder weapon, or telling the police that the Defendant had said this. Later in the cross-examination, the State described the two recorded statements of the Defendant's father to law enforcement officers, with defense counsel's saying that the "first one's not too long, but the second one's about two hours." The trial court then noted that the State was asking to play only the first statement, which was shorter. Defense counsel then said, "You can play the second one too. It was [taken] three days later." Defense counsel made no further comment when the trial court again said that the State wanted to play only the first statement, given by the witness on April 19, 2011. As defense counsel

began his redirect examination of the Defendant's father, he first asked if the witness, his "wife and other family members" gave a recorded statement to police officers on April 26, 2011. Following the affirmative response of the witness, defense counsel then asked to "play that for him," referring to the second recorded statement. The State objected, saying, "Judge, it's my understanding that this interview is eight different people, all talking at one time and it's [c]hock full of mental health stuff." The trial court sustained the objection, saying, "[W]e can't just put willy-nilly all sorts of witness statements in here, so I'm going to sustain." The court then advised defense counsel that he could ask the Defendant's father if, in the second police interview, he said that the Defendant "told him he wanted to get the gun and go (indiscernible)."

We have reviewed the audio recording of the April 26, 2011, joint interviews of the defendant's father and mother, both of whom testified at the trial, as well as his brother and sister-in-law, neither of whom testified. The recording is approximately one hour and forty minutes long and is of poor quality. In the recording, those present conversed amongst themselves regarding the Defendant and the charges against him. The various speakers did not identify themselves during the lengthy conversation. Our evidentiary procedure allows, under certain circumstances, that a witness be questioned regarding a prior statement on the same subject matter as that testified to at trial by the witness. However, we are unaware of any circumstances whereby, in questioning a witness regarding a previous precise statement, a lengthy recording including non-witnesses may be played for the jurors simply so they can hear a single statement of one of the speakers. Ignoring this evidentiary hurdle, the Defendant argues in his reply brief that the State "brought his second statement into play by having the detective offer his opinion" comparing the second and first statements of the Defendant's father.

The proper way at trial to compare the two statements of the Defendant's father about being asked to get rid of the pistol would have been to ask to play for the witness the relevant portion of the second statement, not an entire hour and forty-minute recording with multiple speakers.

Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's request to play the entire statement for the jury.

## **CONCLUSION**

After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

_____

23

ROBERT W. WEDEMEYER, JUDGE